

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**


**NO. 2-09-354-CV**


IN THE INTEREST OF Z.J.L. AND X.T.L.,
CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellant N.L. appeals from the termination of her parental rights to her sons Z.J.L., born September 7, 2005, and X.T.L., born July 9, 2007. The trial court found by clear and convincing evidence that Appellant had (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endanger their physical or emotional well-being and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangers the children's physical or emotional well-being.[2] The trial court also found that

---

[1] *See* Tex. R. App. P. 47.4.

[2] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E) (Vernon Supp. 2009).

termination of the parent-child relationship would be in the children's best interest.[3]

In five points, Appellant challenges the legal and factual sufficiency of the evidence supporting the trial court's endangerment findings and the factual sufficiency of the evidence supporting the best interest finding. Because we hold that the evidence is legally and factually sufficient to support the endangerment findings and factually sufficient to support the best interest finding, we affirm the trial court's judgment.

As we have explained in a similar case,

> Endangerment means to expose to loss or injury, to jeopardize. The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.
>
> . . . Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.
>
> To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct alone, and to determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. . . . A parent's decision to engage in illegal drug use during the pendency of a termination suit,

---

[3] *See id.* § 161.001(2).

when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being. Thus, parental and caregiver illegal drug use supports the conclusion that the children's surroundings endanger their physical or emotional well-being. A factfinder may also reasonably infer from a parent's failure to attend scheduled drug screenings that the parent was avoiding testing because the parent was using drugs. As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.[4]

The trial court heard the following evidence. Appellant, who was twenty-two years old at the time of trial, testified that she became pregnant with Z.J.L. while she was living with the family of L.H., his alleged father. However, L.H. and his family relocated to Chicago during her pregnancy. Appellant lived with A.B., X.T.L.'s alleged father, and his aunt before and during her second pregnancy. At first, Z.J.L. lived with them. But E.L., Appellant's mother, demanded that Appellant let Z.J.L. move to E.L.'s home after two or three months because A.B. was abusive.

Appellant testified that on a scale measuring abuse from one to ten, with ten being really bad, A.B. was an eight. He would body-slam her, hit her with blow-dryers, and give her black eyes. Regarding A.B.'s effect on Z.J.L., Appellant admitted that Z.J.L. had seen A.B. hit her on one occasion but said that the little boy was not paying attention. She testified,

> Q. Okay. What were those two or three months like during the time when [Z.J.L.] was there?

---

[4] *In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at *4 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.) (citations omitted); *see also In re J.O.A.*, 283 S.W.3d 336, 345–46 (Tex. 2009).

A.  There were signs, but, you know, you can't really just spot abuse until the signs start coming up, and the baby was fine. I mean, [Z.J.L.] was fine, you know. He wouldn't mess with him and he wouldn't do it—well, one incident, he did, you know, but he was staying with his auntie and [Z.J.L.] and whatever. When [A.B.] would hit me, his auntie would grab [Z.J.L.] and take him in the next room so that he wasn't sitting there watching it, and [Z.J.L.] was nine months. Eight months. He was little.

. . . .

Q.  . . . . So did [A.B.'s aunt] try to protect [Z.J.L.]? Well, do you know why she would take [Z.J.L.] out of the room?

A.  She would just hold him because [Z.J.L.] would be crying, because he would be in my arms and he was like, one time [A.B.] pulled [Z.J.L.] out of my arms and sat him down and just went for what he knew on me, but [A.B.'s aunt] had grabbed him because he would do a lot of crying when all this stuff would be happening.

Q.  About the time, when you say he went with what he knew on you, so we can be clear to the Court—

A.  I mean, like this one incident that I'm really talking about when he grabbed [Z.J.L.], it was the incident when he was beating me with a blow dryer in the room.

Appellant testified that she never left Z.J.L. alone with A.B. Appellant testified that allowing Z.J.L. to live with her mother back then was a good decision, that she felt like she was getting him out of a dangerous situation, and that moving Z.J.L. to her mother's home took him out of harm's way.

But Appellant remained with A.B., and she testified that he elbowed her in the stomach when she was pregnant with X.T.L. Although she initially indicated that neither she nor A.B. knew she was pregnant at the time, later in her testimony she

4

testified that the elbowing had happened shortly after she had told A.B. that she was pregnant. She testified that after she told A.B. about the pregnancy, he was still rough with her and that she would consent to sexual intercourse with him "to avoid getting a black eye and stuff." It was during this time that Child Protective Services (CPS) first became directly involved with Appellant as a parent.

In February 2007, when Appellant was about six months pregnant with X.T.L., she took Z.J.L. to Cook Children's Medical Center to be treated for an ear infection. Appellant had a black eye, which caused a staff member to call CPS. CPS asked Appellant to temporarily sign over custody of Z.J.L. to E.L., and Appellant agreed.

Appellant continued to live with A.B. for about a week after the incident involving the elbowing and her black eye, until his arrest after a high-speed chase; he possessed two Ecstasy pills at the time of his arrest. She testified that he had sold drugs on the south side of Fort Worth, not in Forest Hill where they lived, and she did not know if he ever brought drugs home. But she testified that he was using drugs. After his arrest, A.B. was sent to prison for violating his probation from a previous drug offense. About two weeks after his arrest, Appellant moved out of his aunt's home.

From there Appellant moved in with her mother. Then she lived with a friend, Trameka Turner, for four or five months. Apparently, Appellant then returned to her mother's home. In July 2008, Appellant and her sons moved into Women's Haven after E.L. allegedly threw a toy truck at Appellant, cutting her lip. They stayed there

about five weeks.  Then they stayed with Trameka again for a brief period before returning to E.L.'s home.

On September 8, 2008, about two weeks after Appellant had returned to E.L.'s home, the Saginaw police responded to a domestic disturbance call made by Appellant.  Appellant, Z.J.L., and X.T.L. had all been living with E.L.  According to Appellant, on that night, E.L. kicked Appellant and her sons out of her home.

Kelli Smith, a CPS investigator, was assigned to Appellant's case that night after receiving a call from the Saginaw Police Department.  She was alerted that Appellant, Z.J.L., and X.T.L. had been kicked out of E.L.'s home and had no place to go.  Smith called the Salvation Army to verify that space was available for Appellant and her sons.  Then Smith made contact with Appellant, Z.J.L., and X.T.L.  Smith testified that the boys appeared clean, clothed, and fed and that upon meeting them, she had no concerns about their physical care.

On the way to the Salvation Army shelter, Smith discussed with Appellant options and programs that could help her with housing, employment, daycare, transportation, and getting assistance.  But Appellant decided that foster care was the best option at the time.  Even though Smith told Appellant that the Texas Department of Family and Protective Services (TDFPS) did not recommend putting the boys into foster care (as getting them out of foster care would require a long and arduous process), Appellant did not change her mind and even put her request in a written affidavit:

I[,] [Appellant,] is [sic] letting my kids go with CPS until I can get everything I need to be a better mama for them. [I'm] letting them go because I have worrie [sic] life[,] and with them[,] it's more stressful to do what I need to do. So I would feel better knowing that they are safe and are clothed, and fed. I am going to do what I need to do so they will have a home to come to. And whatever I need to do to see them and wait for them.

Smith testified that Appellant was not tearful from the time they met, including when she relinquished her sons, and that she did not appear to have any type of emotional reaction when filling out the written affidavit. Smith testified that the only ground for the removal was Appellant's refusal to accept parental responsibility. Smith also testified that at the time of the removal, no actual endangerment had occurred that she knew of, but there was a risk of endangerment.

Appellant testified that at the time she signed the affidavit, she could not take care of the children. She could not "do what [she] needed to do as far as a parent for them." Appellant testified that she made the decision not to go to the Salvation Army shelter—and instead place the boys in foster care—because she felt it was the best decision at the time. However, at trial, she no longer thought that allowing them to go into foster care was a good decision for them, and she noted that if given the opportunity to make the decision again, she would have chosen to "take [her] responsibility by taking care of them." When asked whether she thought the boys had been hurt emotionally by being in foster care, she answered, "I don't know."

Smith interviewed Appellant for background information at the time of the removal. Appellant told her that the boys were both behind on their immunizations

7

and that their Medicaid had lapsed more than three months earlier, and she had not had time to renew it.

Appellant also told Smith that she had been in foster care as a teenager because her mother, E.L., had gone to prison. Appellant testified that she had been told that she was depressed since the age of thirteen years. She stated that she was diagnosed with depression at the age of fifteen while she was in the Nexus Recovery Center after she left foster care and again in July 2008, when she was staying at Women's Haven after E.L. had allegedly beaten her. Appellant testified that she had been depressed for the last year before trial and was depressed during trial. She last took medication for her depression when she was fifteen. At the time of trial, Appellant's psychological evaluation had not been completed, and she had never gone to MHMR.

At trial, Appellant testified about her drug use. She stated that she had first tried marijuana when she was sixteen years old and had also taken Xanax "whenever [she] could get hold if it" at that age. She also testified that she had tried cocaine once when she was nineteen years old and had tried Ecstasy for the first time at that age. She testified that she last used Ecstasy when she was twenty years old.

Appellant also discussed her recent drug use, consumption of alcohol, and her criminal history with Smith. Appellant told Smith that she had last used marijuana

in December 2007 and January 2008, eight to nine months before relinquishment. She testified that she used maybe once a week during that period.

Appellant also told Smith that she would smoke outside while her children were in the apartment. Appellant testified that she had never smoked marijuana in her mother's apartment, on the porch, or even near the apartment but had smoked when she was walking alone in the complex. She testified that she waited about an hour before returning home after smoking, that she would not then be "high" but might be "a little buzzed," that she and her mother both took care of the children after the smoking sessions, and that she had no difficulty taking care of them while under the influence of marijuana. She testified that she never used drugs or alcohol in the children's presence.

Appellant told Smith that she was also "drinking heavily" to "forget about her problems" during that time but denied having a problem with alcohol or drugs. Appellant explained at trial that by "drinking heavily" she meant drinking frequently, as in three days a week instead of one.

At trial, Appellant admitted to using marijuana in November 2008 and on her birthday, May 20, 2009, less than two months before the trial began, but she testified that she did not use drugs from the time she got pregnant with Z.J.L. until she delivered X.T.L. Appellant admitted at trial that she had signed a paper indicating that she had used drugs while the case was proceeding.

9

Appellant was caught stealing diapers and lotion from an Albertson's grocery store in 2007 and subsequently spent three days in jail. However, the time spent in jail was not for the theft, but for an unpaid assault ticket. Appellant testified that she had received the ticket for assaulting another woman during an altercation that took place on her birthday. The boys were at Trameka's house under the supervision of Trameka's relative when Appellant was arrested; E.L. retrieved them that same day.

Appellant testified that she had dropped out of high school in the eleventh grade and had not obtained a GED. Appellant was not working at the time of her relinquishment of her sons but told Smith that she had worked at several different fast food restaurants in the past. Appellant testified that she had not worked since 2006; her last job was working for Church's Chicken in Saginaw, but she quit because she moved. She also testified that she worked at Ebony's Hair Supply and as a receptionist at an income tax preparation business in 2006. Appellant has relied on financial support from E.L., other relatives, and friends since 2006 as well as government aid for the boys.

Obtaining stable employment, however, was a requirement set forth in the CPS service plan. Appellant only sent out five applications during the approximately ten months before trial began and did nothing before trial to obtain a GED or gain any additional job training.

Appellant failed to comply with the family service plan, with the exception of attending nineteen out of thirty scheduled visits with her children and obtaining a

drug and alcohol assessment. She attended one individual counseling session but was ultimately discharged because of her continued failure to attend. In answer to the question, "Why haven't you gone . . . ?", Appellant responded, "Because I didn't know where this was going to lead as far as termination or if I get my rights back, so I didn't go."

She did not attend any parenting classes or get a psychological evaluation. She did not go to Safe Haven Education Program.

Appellant also failed to obtain stable housing. She agreed that she had not had stable housing since the children were born. In September 2008, after she relinquished her children, Appellant apparently moved back to E.L.'s home until the summer of 2009, when she lived with Trameka again for about two-and-a-half weeks. When the trial began, Appellant was living with someone named Bridgett but did not know her last name. Appellant stayed with her about a month and a half. Appellant testified that she moved in with her godmother after the trial began and had been living with her a week before the second day of trial, but she also testified that she was not living with her godmother. Appellant testified that if the boys were returned to her, they could all stay with the godmother until Appellant could "get on [her] two feet." Appellant admitted that E.L. was living with her godmother until she too could get her own apartment.

Appellant's godmother's testimony indicated that Appellant had not been sleeping at her home the past several nights and that she and her children could

11

stay there, depending on Appellant's actions. The godmother also testified that in her opinion, Appellant does not really want the children back; instead, she just wants them in a stable environment where she can visit as often as she would like but not have the responsibility of settling down and taking care of them.

Appellant testified that if the children were returned, then "first of all," she would move in with Vera Dillard or "PeeWee," her mother's estranged husband's aunt whom she had not seen for about a year before trial. PeeWee had told Appellant that she and the boys could live with her "no matter how long it takes until [she] gets on [her] feet." Then, Appellant planned to go to MHMR and to find a job. She also testified that she was willing and able to provide a safe environment for the children.

When asked by the children's attorney ad litem to name something she had changed in the month before trial to put her in a position to care for her sons, Appellant answered that she could not recall and did not know. But she testified that she loved them very much, that she wanted them to have a good life, and that they could have opportunities that she had not had as a child because she "would be supportive"; she "would be their mother." She admitted that she needed to be mentally healthy to take good care of her children, that she had not gone to MHMR despite the advice of her mother, her lawyer, her caseworkers, and her CASA worker, and that knowing that she needs medication, she nevertheless "keep[s] pushing it back."

12

She also admitted that she would need about eight months to get into a position in which she could raise her children in a safe, stable, and nurturing environment.

Tonyia Brown, the CPS caseworker at the time of trial, testified that the boys have been in the same foster home since the removal. She said that the boys are now current on their shots and are physically healthy, but they have asthma and are allergic to mosquitos. She also testified that the boys are developmentally on target, speaking clearly and interacting with their foster family. She opined from observing one visit and reading the case notes that the boys are bonded to both their grandmother and Appellant. Brown testified that the foster parents want to adopt the boys, that she believed termination was in the boys' best interest, and that TDFPS would support adoption by the foster parents if the birth parents' rights were terminated.

Marla Hogan, the CASA worker, explained why she believes termination is for the best in this case. She stated that Appellant has been unable to maintain and does not currently have stable housing, she has been unable and unwilling to find and maintain steady employment, she has failed to complete her service plan, and the children have no viable support system if they are returned to her.

Applying the appropriate standard for reviewing the legal sufficiency of the evidence,[5] we hold that, based upon our review of the record, the evidence is legally

_____

[5] *See In re J.P.B.*, 180 S.W.3d 570, 573–74 (Tex. 2005).

sufficient to support the trial court's endangerment findings regarding Appellant under subsections (D) and (E). Further, applying the appropriate standard for reviewing the factual sufficiency of the evidence,[6] we hold that, based upon our review of the record, the evidence is factually sufficient to support those findings. We overrule Appellant's first, second, third, and fourth points.

Further applying the appropriate standard of review,[7] we hold that the evidence is factually sufficient to support the best interest finding, and we overrule Appellant's fifth point.

Having overruled all of Appellant's points, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, MCCOY, and MEIER, JJ.

DELIVERED: July 1, 2010

---

[6] *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

[7] *See* Tex. Fam. Code Ann. § 263.307(a), (b) (Vernon 2008); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28; *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).